Please call the next case. 114-0871 St. Alexius Medical Center v. Sophia. Counsel, you may proceed. Good morning, Your Honors. Dan Hartman, on behalf of the Plaintiff Appellant, St. Alexius Medical Center. Good morning, Mr. Belcher. May it please the Court. This appeal arises out of what was originally an accepted workers' compensation claim. The claimant, Ms. Briska, suffered a compensable claim in March 31st of 2010, wherein she suffered a rotator cuff injury and underwent surgery for that rotator cuff repair. After she had begun her recovery postoperatively, she was taken back to work with the employer, working light duty. If you wonder what an FCE in March of 2011, at which time she was given essentially permanent restrictions, which were light duty restrictions. In April 2011, she began working at St. Alexius Medical Center within those restrictions. She continued to work within those restrictions at St. Alexius Medical Center through August 19th of 2011. And it's at that point, August 19th, August 20th, where the dispute in this case arises. And the dispute arises because on August 17th of 2011, she went to the emergency room at St. Alexius Medical Center complaining of nosebleeds. She ended up having a high temperature. She was then seen by an ear, nose, and throat doctor who treated her for her nosebleeds. Three days later, on August 20th, 2011, she woke up in the morning complaining of pain. She had not worked. The last day that she worked had been August 19th, 2011. That morning she went to the emergency room at St. Alexius Medical Center, at which time the medical records are clear that she states she woke up that morning and had pain in her shoulder. She then saw her treating surgeon two days later, at which time a history was given again of her waking up and having pain in the shoulder. That is relevant because at this point she had been working since April through August with no complaints of any pain or increased pain to her shoulder while working light duty. The benefits were denied in part after the August 20th, 2011, visit to the emergency room and the August 22nd, 2000 visit to Dr. Schroeder because Dr. Schroeder took her off work on August 22nd, although her examination findings were identical to what they had been when she was released to work in April, 2011. There were no references made to her being worked outside of her work restrictions. There were no references made to any problems she had while working. She was never released to return to full duty work, was she? That is correct. Dr. Neal thought she was, didn't he? Dr. Neal did think that she had been. That was one of the reasons why the commission thought his opinion was not persuasive. Well, that was the only reason they thought his opinion was not persuasive. I would ask the court to look at the brief and look at the medical records and see that in fact Dr. Neal gave at least five separate reasons as to his opinion why there was no relation. And that reason, the thought that she had returned to work light duty is the least important, I'm sorry, full duty, excuse me, your honors, is the least important of all the reasons that he provided. But what makes that decision? Because if we do that, we want to follow the rule. We are not to substitute our judgment for that of the commission on matters of conflicting medical evidence and credibility of the witnesses. How do we do that? You look at the opinion. If you look at the commission's decision, they focused on one element of Dr. Neal's opinion while ignoring a number of other elements which are actually more relevant to the issue in question. And so in your opinion, that's not us reweighing the evidence at all? Isn't that exactly what we're doing? We're reweighing the evidence? Not at all. Really?  Because the opinion that the commission gave did not, in fact, take into account. Yes. Because in fact, your honor, the review of all the evidence leads to an opposite conclusion than the commission would reach. Well, if you discount Neal's opinion, you have a woman who's injured, is under continuous treatment with a doctor, and I disagree with you that she was worked within her restrictions. She wasn't. She testified she was assigned to duties that did not fit her restrictions. And you brought in her supervisor, who even testified that she was assigned to work in patient rooms doing things that she wasn't supposed to be doing, bending, a few other things. And what was this spontaneous event that Dr. Neal relied upon? Did he ever say what it was? A couple things. First of all, I believe that characterization of Ms. Lumpkin's testimony is not accurate. I believe Ms. Lumpkin testified that she had her working. And if you read Ms. Lumpkin's testimony, Ms. Lumpkin's testimony is actually that she thinks the restrictions under which Petitioner is operating are more restrictive than they actually were. If you look at Ms. Britska's testimony at trial, there is no evidence and no restriction that she can't bend over and work below. Her testimony was when she was bending down and working below, her hand started hurting. Not her shoulder, her hand. Furthermore, she didn't have continuous treatment from April to August 2011. She had a scheduled follow-up appointment with Dr. Schroeder after she was released to work for the FCE in April 2011, and she never went to that appointment. And why did she say she didn't go? Because she had to work. That was her testimony. She couldn't go because she had to work. That's an argument that any Petitioner can make. They can't go to the doctor because they have to work. Well, your argument is the same argument that any Respondent can make. And it's up to the Commission to determine who's telling the truth. Understood. She also did, but there are three visits to a personal physician and two visits to the emergency room between April and August 2011 where she makes no complaints at all of any shoulder-related pain. In relation to your question, direct question, Your Honor, Dr. Neal testifies that in his practice as an orthopedic surgeon who specializes in upper extremities, you can have spontaneous repairs of rotator cuff. She has diabetes, which makes her more susceptible to that. No one is suggesting to you that the Commission couldn't have believed Dr. Neal. They just didn't. Who makes the determinations of whether he's believable? Not us. That's the Commission's job. Understood. The focus of my argument today is essentially around the penalties aspect of this award by the Commission. You rely on Dr. Neal's opinion in not paying the benefits? We rely on several factors, which includes Dr. Neal's opinion. Dr. Neal's opinion came when? In March of 2012. And when did you stop paying benefits? August of 2011. So you couldn't rely on Dr. Neal's opinion to stop making payments a year before he gave it, could you? Exactly. But if Dr. Neal's opinion is flawed, as you say, there are other reasons to not look at this as a compensable situation. We've talked about several factors that I've talked about. I suppose one might be in agreement with you if Dr. Schroeder wasn't continuously sending updating letters to your adjuster. This doctor not only sent notices to the employer, he sent notices to your adjuster every time he saw this woman, updating your adjuster on what her condition was. And never once did he say that she was able to go back to full-time employment or full-duty work. He had restrictions on her at all times. And I disagree with you as to what Ms. Lumpkin had to say, because I got her testimony sitting right in front of me. According to Lumpkin, she tried to accommodate the plaintiff's work restrictions, having other people do her work, and that the woman never complained. But she also indicated that the work she was assigned to doing did involve bending, leaning, and reaching motions. She admitted that the tasks involved bending, leaning, and reaching motions, along with pushing and pulling of a mop with both hands. But what you just said are not outside the restrictions per functional capacity evaluation. I'm not aware of the restrictions that Schroeder put on her. Limited lifting from floor to waist 20 pounds. Limited lifting from waist to shoulder 10 pounds. Limited above-shoulder lifting 8 pounds. Limited prolonged above-shoulder activities and required resting periods for above-shoulder tasks. And pushing 35 pounds and pulling 45 pounds. So all those things that Ms. Lumpkin testified about are within the restrictions that she was given by her treating physician. In relation to Dr. Schroeder's ongoing medical reports, he makes no reference to this being work-related until nearly a month, more than a month, after her relapse, if you want to call it that, in August of 2011. And, in fact, in the first visit that he had with her on August 22, 2011, he makes no statement at all in relation to work activity. Can we get back to your justification for cutting off the TTD? Yes. You've got Schroeder's letters. You've acknowledged they're ongoing. You sort of vaguely then alluded to the opinions of the other doctor for cutting off the TTD, but now we find out that it came months later after you. So what was the justification in the delay? You can't rely on a medical opinion because you had no causation opinion when you cut off the TTD, did you? When she was seen at the emergency room on August 20th, she had not worked that day. She said she woke up in the morning with shoulder pain. She signed a document when she came back to work light duty agreeing that she would tell the employer if she had any issues being worked outside of her restrictions or any pain while working within those restrictions. That never happened. So you have a situation where she begins working with restrictions in April. She continues to work within those restrictions for several months. There are no complaints made that she's being worked outside of those restrictions or any medical notes saying that I can't work or I'm having pain. Was she undergoing physical therapy and pain medication? No. She was not? She was not. Then she goes into the emergency room on August 17th with a bloody nose and has a fever. She works the 18th and the 19th. No complaints made, no anything to the employer. Then she wakes up on the 20th. She wasn't scheduled to come into work. Goes to the emergency room and at that point you have a history saying I woke up this morning with pain in my shoulder. She hadn't worked. She went to bed without pain. She woke up with pain. Then two days later she sees Dr. Schroeder. Dr. Schroeder makes no reference to anything being work related. He also takes an exam. If you look at the exam findings from the last visit Dr. Schroeder had after the FCE to the exam findings in August 22, 2011, the exam findings are identical. There's no change in range of motion. There's no change in the only thing that's different is she says she had pain after waking up. And at that point Dr. Schroeder says, well, I'm going to take you off work completely, although there was no change in her examination compared to when he released her back to work with restrictions. Can I ask you a question? According to Dr. Schroeder, what were her restrictions when he authorized her and released her to go back to light duty work? Did he restrict her from performing any over activity, pushing, pulling, climbing, repetitive motions, or lifting over five pounds? I'm sorry, Your Honor, because there were two different times when he released her to work. Do you mean in April 2011? I mean in 2010. September 13, 2010. What did he release her to? What were her restrictions? Sent a letter to Lisa setting? Yes, Lisa setting. Yes, telling her what the work restrictions were? He did. And those work restrictions were accommodated. What were the work restrictions? You did indicate that there was references about reaching overhead and reaching and pushing and pulling. And pushing and pulling. And then on October 25th of 2010, she treats with him again and he sends another letter. This time, the restrictions, she's refrained from lifting 10 pounds and continued all of his prior restrictions of no overhead activity, pushing, pulling, climbing, or repetitive motions. And sent that to setting again, didn't he? Did he do that? Yes, he did. And when she went back to work, what did she say she was told to do? When, in April 2011? January of 2011. She was assigned to her previous duties of cleaning patient rooms. And when she was asked whether she was able to perform the duties, what did she say she had? What was her answer? She had difficulty doing it. She said she had difficulty doing it, but she had to do it because they told her she had to do her work. Well, that contradicts a statement that she also made during trial, where she knew and had signed a document stating that she would report to the employer when she was worked outside of her restrictions. She also testified that many of the tasks that she was required to do to clean a patient room involved bending, pushing, and pulling with both hands. But those were not restrictions in April 2011. No, she was testifying in January of 2005. Understood. But she had the FCE in April 2011. Did Schroeder remove his restrictions? He released her consistent with the functional capacity evaluation. But she had all these work restrictions in January. She's under full treatment. She's being worked in excess, according to her, of her work restrictions. And she's under treatment. Now, your doctor, Dr. Neal, seems to think she's released to full-duty work back in April. She wasn't. And he also talks about some spontaneous thing that happened, and the commission said, well, tell us what that is. And he didn't. He couldn't. He did. Well, and furthermore, there's a fact that is being missed about that rotator cuff, though. If you look in the record, there's a June 2012 MRI, which shows she doesn't have a new rotator cuff. Counselor, your time is up. Thank you. Counselor, you may respond. Good morning. May it please the Court. My name is Matt Belcher, and I'm here today on behalf of your injured worker, Mrs. Grishka. Good morning, Mr. Hartman. I know Dan Hartman. Our injured worker? Yes, the injured worker in this instance. I know Dan Hartman. Dan Hartman is a friend of mine. And if Dan Hartman was in charge of this claim file, I don't think we would be here today. However, the person who controls the purse strings has dictated the terms of this claim. Here, here, here, here. Let's just get to the facts. Don't tell us the background of who's controlling claims. This isn't the commission. You can't get sympathy out of us. You get law from us. I appreciate that, Justice Kennedy. Strictly law. Strictly law. Let's get to the issue. Why is this not against the manifest way of the evidence? It's not against the manifest way of the evidence because we have two competing medical theories, one of which is based upon reality and one of which is tethered to fantasy, to be honest with you. Do you have an opinion that it's work-related? Do you have a causation opinion in this case? Well, here, if, if, if, if the ex- You have no causation opinion in this case. What you have is a rejected causation opinion of Dr. Neal. And now you're left with treatment. Just, if we just take one step backwards and just look at the situation, Mrs. Brzyczka is a 65-year-old Polish lady who began working for St. Alexis Medical Center in 2004. We understand that. Do you have a causation opinion? Which doctor gave it and where will we find it? I think you can find it in Dr. Schroeder's. And what did he say? And when? And just as a little bit of background, Dr. Schroeder works, is affiliated with St. Alexis Medical Center. Can I slow you down and have you answer my question? Yes. What did Dr. Schroeder say and why did he say it? Dr. Schroeder felt that this was a post-operative recheck. Yes. From the original surgery that he performed. The post-operative recheck, consistent with the commission's decision, indicates that this lady is under treatment from the original workplace accident in 2010 when she fell and slipped on water that was left behind by her co-worker. The post-operative recheck indicates that it relates back to the first injury, the first surgery, which is not disputed. Since the date of the first surgery, Mrs. Brzyczka has been consistently under the medical treatment and care of Dr. Schroeder, the St. Alexis affiliated orthopedist. Since the date of the first surgery, Mrs. Brzyczka has been a candidate for surgical manipulation. A surgical manipulation is a procedure where they attempt to break apart the adhesive capsulitis and increase range of motion in the lady's arms. The entire medical records here indicate that this all stems from the first accepted workplace accident. Unfortunately, Dr. Schroeder, the St. Alexis Medical Center affiliated orthopedist, iatrogenically introduced an infection into Mrs. Brzyczka's shoulder. Subsequent to that infection, she developed a boil that had to be surgically removed. She got all of her treatment at St. Alexis Medical Center. Since the date of the first accepted accident, she has never been returned back to full duty. She's never reached a baseline, a pre-surgical baseline that would allow her to be considered at maximum medical improvement. As she's never been at maximum medical improvement since 2010, if the workplace accepted accident, through the post-operative research of Dr. Schroeder, it's the position of Mrs. Brzyczka, and in fact, that's the cause of connection. So in response to my question, he was never asked, do you have an opinion within a reasonable degree of medical certainty as to whether her current condition is related to her work injury? That's correct. He was never asked that? He was not. And if you would like, I'll explain why it's not necessary. I don't care why you didn't ask the question. I think that there is a misapprehension and misunderstanding of the law in this case. The role of any adjudicator is to ascertain certain facts and apply them to a rule of law. I think that if you have the wrong rule, you're going to have the wrong outcome. The rule in this case, according to the defendant, is that somehow we need to show that there wasn't some spontaneous event. I think the better case law, if we follow the Volvo precedent, unless we're going to overrule Volvo, is that we have a lady going along a track here, subsequent to a workplace accident. It's their position that there's some sort of intervening event. That's the correct application. Was there an intervening event that caused a new injury that broke the chain of causal connection? I submit to you if Mrs. Brzyczka was walking across the street and was run over by her bus, then obviously we have a violent traumatic event that breaks the causal connection. Here we have a lady continuing with the same symptoms that she testified, that this notion that she went to bed and her arm didn't hurt and woke up and her arm did hurt is a misunderstanding of her testimony. What was Dr. Romeo's opinion of the 2011 MRI? What did he say it showed? Dr. Romeo is of the opinion that this lady had a non-healing event or a re-tear. He opined that the situs of the anchor caused the infection to go into her shoulder. He said a re-tear of a rotator cup and or a non-healing event. Yes, Judge. Now, a non-healing event clearly would be causally related to the original surgery. What about a re-tear of a rotator cup? A re-tear or the need for a revision surgery doesn't necessarily have to have an event that's of such violence as to be an intervening cause of action. We have an ongoing course of treatment, an ongoing resolution of the anatomy of this lady's shoulder. Now, she has a full thickness rotator cup that's described as massive. In order to repair it, there's an anchor attached. Let's just make life simple, okay? Could she re-tear her rotator cup in an event that was not related to her work injury? Yes. Of course. So when he said re-tear and or non-healing event, he doesn't actually make the case for it. He makes it a possibility. If it's the non-healing event, then you've got your causal connection. If it's a re-tear, then the question is how did she re-tear it? Well, Judge, doesn't Teska just tell us that even if this lady's bowling, that it relates back to the first accident because but for the original surgery and but for the original accident, she wouldn't have been in this situation? Who says? Excuse me. You got evidence of that in here? Did somebody give you that opinion? The testimony of Ms. Bershka that was accepted by the Workers' Compensation Commission is that her shoulder never improved. It always had pain. I understand that. Yes. I'm trying to figure out. You keep telling me this. There's no opinion in this record, causation opinion, from a physician. There is none. You've got Neal. He gives the only causation opinion. Now, the question becomes in the absence of a causation opinion for the petitioner and in the face of the commission's rejection of the only causation opinion in the record, what then can the commission do? Because you have no opinion. I've looked at this record six ways from Sunway. You haven't got one. Nowhere. Now, you've got a could be in Romeo. That you have. But if they reject Neal and you have no causation opinion, what then can the commission do with this set of facts? I don't think that I need a separate causal connection opinion. Will you answer my questions? Yes. Try that for a minute, okay? What can the commission do with it? They can determine that the lady has never reached a pre-surgical baseline and, therefore, present condition relates back to the original workplace accident absent evidence of an intervening event of sufficient violence  Is it required that there be a medical opinion in order to support a causation finding by the commission? No, I don't believe that such an opinion is required, nor do I believe it's consistent with the mandate of the Workers' Compensation Commission. Was she worked within her restrictions or was she not? She was worked outside of her restrictions. Did she testify that she worked outside of her restrictions? She did. And let's get to the question of the penalties. Neal gave his opinion in March of 2012, is that right? Yes, Judge. And they cut her off August of 2011? Yes, Judge. Okay. And what existed as of 2011 other than the absence of any recorded medical treatment for the shoulder from April to August? During April to August, the lady had a nosebleed. She went to go see an ear, nose, and throat doctor. That doctor didn't record any shoulder problems, unsurprisingly. She had a gastritis problem. She went to see her gastroenterologist. He said he notated no shoulder complaints, not unexpectedly. During the entire time she remained at work, she performed the job duties that Angela Lumpkin described, which were outside of her restrictions. There's no new intervening events. She has pain every day. She has limited range of motion every day. She remained a candidate for a surgical procedure since her return back to work. The lady's worked there since 2004. She works hard. Her supervisor said that she does a great job. Dr. Neal, seven months later, tells us that according to his testimony, it's based upon his understanding that the petitioner was, A, released from medical care by Dr. Schroeder without any recommendation of continued treatment. That's false. Well, his testimony was, his opinion was she was released for full duty. Secondly, B, right, returned full and restricted duty after the surgery. False. By Schroeder. That didn't happen. And what was his opinion about this spontaneous event? That it must have been a spontaneous event because she woke up and said my shoulder hurts and went to the St. Alexis Medical Center emergency room and then two days later saw the St. Alexis Medical Center affiliated orthopedist, Dr. Schroeder. His conclusion actually was, and I quote, a new condition of her shoulder. That's Dr. Neal's opinion. Around August 19th. Right. That's Dr. Neal's opinion. Did he ever specify what he meant by that? No. It was a new spontaneous event. So we have Dr. Neal's opinion. Released from care. False. Returned to full unrestricted duty. False. Petitioner stopped working for several months prior to the recurrence. Now, this is very important. Nobody's talked about it. I got that from appendix page 11. Here, the question is here. Released full duty. He's only the person that she hadn't returned back to work since July 21st. Where he came up with that information, I have no idea. So here's Dr. Neal. Dr. Neal says, well, she's full duty. With MMI. Discharged from care. Doing her job with no problems. She didn't even work July, August. That sounds like a new event. But all that information is false. And whether Dr. Neal knew it was or not, Mr. Archman's insurance adjuster knew that it was not correct. That she had been there to work on August 19th, the day before. She had been doing her job to the best of her ability. Doing what her supervisor considered to be a great job. All along, treating with the same doctor affiliated with this medical center. He goes, when she goes back in on August 22nd to see him, he says, she's here for a post-operative recheck. And sends it back to the workers' compensation carrier. Now, I submit to you that in order for that not to be related, there needs to be some sort of event. I think that the respondent in this case misapprehended what the law was. And I think if we look at page 3 of their reply brief, we'll see what they think the law is. And it's this. So the defendant's argument, my argument, is that the light duty worsened the right shoulder symptoms. Okay, that's true. But it says that this finding is fundamentally necessary to support the award. I don't think it's necessarily fundamentally required to support the award. When the lady never returned back to a pre-injury baseline, she was always under the care of their orthopedist. She was always a candidate for a surgical manipulation process. And the lady is doing the best that she can, going back to work, doing the work that they assigned to her, and saying, oh, you signed some piece of paper saying that you weren't going to work outside your restrictions. That's all well and good until you're at work every day, and they tell you that you need to clean this room. The lady goes in after people are discharged, and she has to mop up the blood that's underneath the bed when it drains down. And the only way to do that is to take a wet mop that's long, has a stick, and they do it in a figure-eight motion to remove the blood from underneath the bed and around the floors. Angela Lumpkin, the supervisor, testified that that's the work she's doing. Plus, she has to wash walls, remove bed linens. Whether we realize it or not, removing bed linens is often overhead work. You need to bend at the waist, pull. So she's doing all of the tasks, no complaints, doing a great job. She wakes up, her shoulder hurts. She goes back to the St. Alexis Medical Center emergency room, says, I woke up, my shoulder's worse. She never went to bed that her shoulder was doing great. Her shoulder's worse. She goes back to the same orthopedist. He sends back the note back to the same workers' compensation adjuster saying that she's here for a post-op or a pre-check, and I'm taking her off of work. And then there's a big deal made that there is no objective change in her symptoms. Well, there is. Dr. Schroeder sent her back to work within certain restrictions. She was unable to perform that. He re-evaluated her, and he removed her from work. Did they pay her? They did not. Did they pay her in August? No. September, October, November, January, February, March, they sent her to Dr. Neal. Dr. Neal is told, hey, this lady's been in MMI for several months. She's been doing her full-duty job. She didn't even work in July and August. So if he really believed that to be accurate, well, maybe there would be a basis for his opinion. But when they got the report back saying that that's the reason why he thought that this was a new spontaneous event, they knew or should have known that the information he had was incorrect. And then, did they pay her? No, they did not. And now here we are two years later having the same argument, and do they come to you and say, well, it was a misunderstanding, take pity upon us, we're off, we did the best we could? No, they say this lady has a spontaneous injury. Again, Dr. Neal is right. And then we're here again litigating the entire situation when all Ms. Bierschke needs is the payment of her TTD benefits and authorization for more medical treatment and all of the reasons that we're here before you today. And so we ask that you affirm the commission's decision in toto and give Ms. Bierschke the compensation she's entitled. Thank you. Thank you, Counsel. Counsel, you may reply. In relation to Ms. Lumpkin's testimony, Ms. Lumpkin testified that she thought the restrictions were no lifting over 15 pounds and not a lot of bending. She testified that she did not work Ms. Bierschke outside of those restrictions. As you see, when compared to the FCE and the records of Dr. Schroeder, those are actually more restrictive restrictions that Ms. Lumpkin was operating under than Dr. Schroeder actually had her operating under. There is no evidence to support, in fact, that she was asked to work outside of restrictions, whether they were mistaken restrictions by Ms. Lumpkin or those of Dr. Schroeder from the date of her FCE when Dr. Schroeder said you're released with permanent restrictions until August of 2011. It is relevant, in fact, that Ms. Bierschke saw her family doctor on several occasions during that time period, and she was in the emergency room on two different occasions during that time period, and there was no mention made at all of any complaints related to that right shoulder until she woke up one morning after not working and had pain. The reason that's relevant is in her own testimony. The only complaint she testified about while working light duty was to her right hand. Not her shoulder, not her arm, her right hand. And it was her right hand from having to wipe down here. Not her shoulder, her right hand. It is relevant that, in fact, when the treating orthopedic, Dr. Schroeder, saw her two days after the emergency room visit in August, that there were no objective changes in his examination, none. If you look at the range of motion tracking, the range of motion tracking is consistent until after she has the injection that Dr. Schroeder gave her in September of 2011 after this event. Dr. Schroeder's own medical records, as the justice pointed out, do not give a causal connection opinion, and there's no reference made anywhere regarding an issue with light duty work in the medical records until she's seen in physical therapy over a month after she goes into the emergency room in August of 2011. Does he need a causal connection opinion? He doesn't need one specifically, does he? He doesn't. If the rest of the facts support that, you are correct. But, in fact, he doesn't give one. He doesn't comment on it at all. And as is pointed out, even Dr. Romeo is wishy-washy on his causal connection opinion. And the medical evidence also suggests that there's also an MRI that none of them comment on about whether she even has a new rotator cuff tear that was completely overlooked by the commission or the arbitrator. There are several factors upon which the respondent made its decision. She testified that she never ceased to have pain from the beginning all the way through August. That's correct. And the commission found that she testified permanently. She did. She had the same pain from the day she had surgery up until August. That is correct. But it was with that pain that she underwent the functional capacity evaluation and was released to work with those restrictions. Pain is subjective. She said she had it. She didn't talk about any new pain. The two new pains that she talked about were to her right hand while doing light duty, and then when she woke up on the morning of August 20th and had this increase in pain, which Dr. Neal testified can happen to someone who has the diabetes that she had. Dr. Neal's report says that, by all accounts, she had clinically plateaued and had reached MMI by April 21, 2011. What were his reasons for that? His reasons for that were the review of Dr. Schroeder's medical records. And if you look on page 2 of the facts section of my brief, when you look at the medical records with the range of motion findings, October 2010 through April 2011, you have essentially the same findings on exam for range of motion for her examination. And those findings actually continue up until December of 2011, when she's been off work at this point in all capacity for at least four months. Didn't he indicate that one of his reasons for, or several reasons for indicating that she had clinically plateaued and reached MMI is because she had been released from treatment by Dr. Schroeder? And in addition to that, she went back to full duty? That was not true. The full duty part was not true. She had been released from care, and there were other factors. Why was she released from care by Dr. Schroeder? When did Dr. Schroeder release her from care? He told her to return to work, return PRN, which she did not do. He told her to return in one month is what he told her. He told her to return in one month, but she didn't keep the appointment. Why? Her quote was, had to work. But one would think that if the pain was that severe, she would have gone to the doctor's appointment, as she did to the emergency room on August 20th, and to the doctor on August 22nd. And the only pain she had was to her right hand, as she testified. And when he wrote his letter to St. Alexis, as of the April 21, 2011 hearing, he told St. Alexis that she was currently under his care. Right, because he had just seen her. Yeah. So he never released her. And there is no evidence in this record that she was ever released by him. Is there? That is correct. Okay. Counsel, your time is up. Thank you, Your Honor. Thank you, Counsel Ball, for your arguments in this matter. If you've taken under advisement, written disposition shall issue. The Court will stand at brief recess.